AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
SEP 21 2018
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>1 gold Apple Cellular Phone<br>Model: iPhone 8; IMEI: 354837094640783 | )<br>)<br>) Case No.  **18MJ5008**<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2, which is incorporated by reference.

located in the ____Southern____ District of ____California____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-2, which is incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841 and 846 | Distribution of controlled substances and conspiracy to do the same |
| 21 U.S.C. §§ 952, 960, 963 | Importation of controlled substances and conspiracy to do the same |

The application is based on these facts:
See Affidavit of Border Patrol Agent Luis A. Corrales, which is hereby incorporated by reference and made part hereof.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Luis A. Corrales, Border Patrol Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  9-21-18

_____
Judge's signature

City and state: San Diego, CA

Hon. Nita L. Stormes, Magistrate Judge
*Printed name and title*

I, Luis A. Corrales, an Agent with the United States Border Patrol, assigned as a Task Force Officer with the Drug Enforcement Administration, having been duly sworn, depose and state as follows:

## INTRODUCTION

1. I submit this affidavit in support of applications for search warrants to search the following electronic devices:

>One (1) black colored Samsung Cellular Phone
>Model: Galaxy 8
>IMEI: 355982080389489
>(**Target Device 1**), as described in Attachment A-1.

>One (1) gold colored Apple Cellular Phone
>Model: iPhone 8
>IMEI: 354837094640783
>(**Target Device 2**), as described in Attachment A-2.

2. On September 5, 2018, **Target Device 1** and **Target Device 2** (collectively, the "**Target Devices**") were seized from Jose Armando HERNANDEZ-Velazquez and Sandra Cristina OSUNA-Nunez (collectively, "Defendants") after Border Patrol agents found approximately 25.6 kilograms of fentanyl inside the vehicle HERNANDEZ was driving (with OSUNA as the passenger) at the Interstate 8 Campo Border Patrol Checkpoint. Defendants have been charged with possession with intent to distribute fentanyl, in violation of 21 U.S.C. § 841(a)(1). As set forth below, based on my training and experience, there is probable cause to believe that the **Target Devices** contain evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846, possession of a controlled substance with intent to distribute and conspiracy to do the same, and 21 U.S.C. §§ 952, 960, and 963, unlawful importation of a controlled substance and conspiracy to do the same.

3. The information contained in this affidavit is based upon my experience, training, and consultation with other law enforcement agents. The evidence and information contained herein based upon reviews of official reports and records, upon conversations with other Border Patrol and DEA Agents, and my personal observations and knowledge. Because this affidavit is made for the limited purpose of obtaining a

search warrant for the **Target Devices**, it does not contain all of the information known by me or other federal agents regarding this investigation. Dates and times are approximate, and refer to Pacific Standard Time unless otherwise specified.

## EXPERIENCE AND TRAINING

4. I have been a federal agent with the United States Department of Homeland Security, Office of the Border Patrol since September 2014. I am currently assigned as a Task Force Officer (TFO) in the DEA San Ysidro Resident Office, San Diego Field Division, in San Diego, California. I have conducted numerous criminal investigations into violations of federal and state law including, but not limited to, narcotics trafficking, weapons violations, and organized criminal activity. Prior to becoming a Border Patrol Agent, I was employed for seven years, as a police officer with the Doña Ana County Sheriff's Office in New Mexico.

5. During my law enforcement career, I have obtained experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, computer evidence identification, computer evidence seizure and processing, and various other criminal laws and procedures. I have personally participated in the execution of numerous search and seizure warrants.

6. Based upon my training and experience as a law enforcement officer, I am familiar with the ways in which drug smugglers and traffickers conduct their business. During the course of my duties, I have (a) worked as a co-case agent, directing specific drug-related investigations; (b) worked as a surveillance agent who observed and recorded movements of individuals suspected of trafficking drugs; (c) participated in the execution of search warrants related to drug investigations; (d) initiated and executed numerous arrests for drug-related offenses, including possession with the intent to distribute; and (e) interviewed criminal defendants, witnesses, and informants in furtherance of investigations into the illegal smuggling and trafficking of controlled substances.

Through these duties, I have gained a working knowledge and insight into the operational habits of drug smugglers and traffickers.

7. Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics smugglers and traffickers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators in order to further their criminal activities. This is particularly true in cases involving distributional quantities of controlled substances. Typically, load drivers transporting narcotics are in telephonic contact with co-conspirators at various points of the transportation in order to receive instructions on where and when to deliver the controlled substances.

8. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

   a. Drug traffickers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

   b. Drug traffickers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

   c. Drug traffickers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

   d. Drug traffickers will use cellular/mobile telephones to direct persons to synchronize an exact drop off and/or pick up time of their illegal cargo.

   e. Drug traffickers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of Border Patrol checkpoints or Ports of Entry.

f. Drug traffickers and their co-conspirators often use cellular/mobile telephones to communicate with persons who transport their narcotics and/or drug proceeds.

g. The use of cellular telephones by drug traffickers tends to generate evidence that is stored on the cellular telephones, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

9. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

10. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I have learned, through my training and education, that searches of cellular/mobile telephones associated with narcotics smugglings yield evidence:

a. tending to indicate efforts to import fentanyl or other federally controlled substances from Mexico into the United States, and to possess those substances with the intent to distribute them within the United States;

b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the importation of fentanyl or other federally controlled substances from

4

       Mexico into the United States, and possession of those substances with the intent to distribute them within the United States;

  c.  tending to identify co-conspirators, criminal associates, or others involved in importation of fentanyl or other federally controlled substances from Mexico into the United States, and the possession of those substances with the intent to distribute them within the United States;

  d.  tending to identify travel to or presence at locations involved in the importation of fentanyl or other federally controlled substances from Mexico into the United States, and the possession of those substances with the intent to distribute them within the United States, such as stash houses, load houses, or delivery points;

  e.  tending to identify the user of, or persons with control over or access to, the subject cellular/mobile telephone; and

  f.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

11.  On September 5, 2018, Border Patrol Agent (BPA) Salvador Contreras, BPA Robert Dominguez, and BPA Jesus Pina with his Canine partner were assigned to the Interstate 8 Westbound Immigration Checkpoint. The checkpoint was fully operational with all signs visible and lights functioning. The Interstate 8 (I-8) Westbound Checkpoint is located in Pine Valley, California and is approximately 15 miles north and 8 miles east of the Tecate, California Port of Entry.

12.  At approximately 1:53 p.m., a silver Mini Cooper, bearing CA license plate 6CKV280, approached the primary inspection at the Interstate 8 Checkpoint. BPA Contreras was working the primary inspection area. BPA Contreras questioned the occupants, later identified as Jose Armando HERNANDEZ-Velazquez (the driver) and Sandra Cristina OSUNA-Nunez (passenger), as to their citizenship. HERNANDEZ stated he was a Mexican citizen with Lawful Permanent Resident status; OSUNA stated she was a B1/B2 visa holder. BPA Contreras questioned HERNANDEZ as to his

5

profession. HERNANDEZ responded he was unemployed and was on his way to the Viejas Casino to do some shopping. BPA Contreras observed HERNANDEZ's lips were heavily quivering and his eyes were wide open and staring into the distance as he answered BPA Contreras' questions.

13. At the same time, BPA Pina was walking to the primary inspection area when his canine partner alerted as they approached the aforementioned vehicle and began to drag BPA Pina towards the vehicle. BPA Pina allowed his canine partner to follow the source of the alert. The canine drafted towards the rear driver's side fender and attempted to make entry into the vehicle. BPA Pina continued to walk his canine partner around the vehicle to the following car, however his canine partner would not continue past the Mini Cooper.

14. BPA Pina asked BPA Contreras working in the primary inspection area to send the vehicle to secondary for further inspection. BPA Pina and his canine partner followed the vehicle into the secondary inspection area. At this time, BPA Contreras was relieved from the primary inspection area and also followed the vehicle to secondary inspection.

15. In the secondary inspection area, BPA Dominguez questioned the occupants as to their country of citizenship. Both occupants stated that they were Mexican citizens. BPA Dominguez instructed the occupants to exit the vehicle. BPA Dominguez asked the driver, Jose Armando HERNANDEZ-Velazquez if he smoked marijuana and HERNANDEZ stated, "yes." BPA Dominguez asked HERNANDEZ if there was anything illegal in the vehicle. HERNANDEZ stated, "no." BPA Dominguez asked for consent to perform a canine sniff of the interior and exterior of the vehicle and also asked for consent to search the vehicle. HERNANDEZ gave consent.

16. BPA Pina's canine conducted a canine sniff of the vehicle by starting at the front driver's side headlight. BPA Pina again observed an alert from his canine partner and allowed his canine partner to follow the odor into the vehicle through the driver's side door that was left open by HERNANDEZ. BPA Pina's canine partner continued to

6

follow the odor and indicated to the driver's side floorboard. BPA Pina advised BPA Contreras of the alert and location. BPA Pina returned his canine partner to the service vehicle.

17. BPA Contreras inspected the bolts that secure the seat to the floorboard. BPA Contreras observed a black color on the bolts that appeared to be shiny and inconsistent. The black color was only on the inside of the head of the bolt and appeared to be a black "Sharpie" marker. In BPA Contreras's training and experience, black sharpie marker is used to mask tooling by concealing recent metal scarring.

18. BPA Contreras tapped the bottom of the floor from underneath the vehicle and placed his hand on the floor inside of the vehicle. In BPA Contreras's experience the impact of the tap from the outside of the vehicle is normally felt within the vehicle. BPA Contreras tapped the vehicle from the outside and was not able to feel the impact from within. In BPA Contreras's experience this was an indicator to a possible aftermarket compartment within the floor of the vehicle. At this time, the vehicle was transported to the I-8 hydraulic lift for further inspection.

19. At approximately 2:00 p.m., BPA Contreras lifted the carpet on the driver's side and observed aftermarket welding and silicon around the edge of the entire floorboard. Agent Contreras removed the silicone and discovered an aftermarket floor compartment. BPA Robert Dominguez utilized a fiber optic scope within an opening and observed vacuum sealed bundles within.

20. At approximately 2:00 p.m., U.S. Border Patrol dispatch was notified of the narcotic seizure and requested to commence a seizure packet. In the following few minutes, U.S Border Patrol Dispatch advised an alert was recently placed on the vehicle. BPAs Pina, Contreras and Dominguez, removed 21 brick packages and 2 pill form packages, wrapped in vacuum sealed packages, from the floorboard compartment. Several of the packages had visible markings present on their exterior. One of the legible markings appeared to be a Mercedes Bens logo and the initials "TV" written on numerous packages.

21. At approximately 2:30 p.m., a scan of the suspected narcotics was tested by BPA Dominguez and witnessed by BPA Joseph Lopez utilizing a government issued Thermo Scientific TruNarc narcotic identifier. The TruNarc analyzed the contents of one of the bundles and the sample tested positive for the properties and characteristics of Fentanyl. Jose Armando HERNANDEZ-Velazquez and Sandra Cristina OSUNA-Nunez were thereafter arrested.

22. BPA Dominguez weighed the Fentanyl using a calibrated scale. The total gross weight of the 21 Fentanyl bricks was 23.52 kilograms. The Fentanyl bricks had an estimated value of $1,176,000.00 USD. The total gross weight of the 2 Fentanyl pill packages was 1.46 kilograms. The Fentanyl pills had an estimated value of $73,000 USD. The packages were inventoried and were placed in evidence boxes.

23. Based on TECS crossing history, the smuggling vehicle had crossed into the United States from Mexico through the Calexico West Port of Entry on 09/05/18 at 11:20 p.m. – approximately two hours prior to arriving at the Interstate 8 Westbound Checkpoint. Both HERNANDEZ and OSUNA were in the vehicle when it crossed into the United States.

24. Following his arrest, HERNANDEZ was read his *Miranda* rights. He waived those rights and elected to give a statement. During the interview, HERNANDEZ admitted to knowing he was transporting illegal merchandise for a compensation of $2,500 USD. HERNANDEZ stated he was involved with a male individual by the name of "Raymundo." HERNANDEZ said Raymundo and two other individuals, provided the smuggling vehicle to him and registered the vehicle in HERNANDEZ's name. The individuals told HERNANDEZ the vehicle was his on the condition that they would be able to take it for the purpose of loading. HERNANDEZ said he has transported what he imagined to be an illegal substance approximately six to seven times, being payed $2,500 USD each time. HERNANDEZ said he received instructions to drive to a mall in either Riverside, CA, or a mall near Anaheim, CA. Once at the location, HERNANDEZ would shop while someone unknown to HERNANDEZ would take the vehicle and off load it.

HERNANDEZ said he could tell the vehicle was off loaded because it always felt lighter in weight on his return to Mexico.

25. Based on documents found in the smuggling vehicle, HERNANDEZ was driving the vehicle as early as November 16, 2017 (HERNANDEZ received a speeding ticket while driving the car on that day). And as stated, the vehicle was provided to him for the purpose of smuggling drugs. Accordingly, it appears HERNANDEZ's involvement in drug smuggling began prior to November 16, 2017.

26. OSUNA also waived her *Miranda* rights and elected to give a statement. She denied knowing about the drugs, and denied knowing about HERNANDEZ's involvement in smuggling drugs.

27. However, after both initial interviews were completed, HERNANDEZ volunteered information regarding OSUNA's knowledge of his illicit activity. HERNANDEZ said OSUNA had found out approximately three months prior and had been trying to get him to stop. HERNANDEZ also stated OSUNA had once asked him how much "they" had paid him.

28. TECS crossing records reveal that OSUNA's first crossing into the United States from Mexico within the last 18 months was on March 17, 2018. She crossed into the United States with HERNANDEZ approximately three times in March 2018, twice in April 2018, twice in May 2018, twice in June 2018, four times in July 2018, four times in August 2018, and then on September 5, 2018 – the same day HERNANDEZ and OSUNA were arrested in the instant case.

29. When I arrived at the Campo Border Patrol Checkpoint, the **Target Devices** were in evidence bags, each bag labeled with the name of either HERNANDEZ or OSUNA, in order to identify whose personal effects were contained within each of the respective evidence bags. During their respective post-*Miranda* interviews, HERNANDEZ claimed ownership of **Target Device 1**, which was in the evidence bag

with HERNANDEZ's personal effects, and OSUNA claimed ownership of **Target Device 2**, which was in the evidence bag with OSUNA's personal effects.[1]

30. Based on my training, experience, the location of the drugs, and the manner of concealment, I believe the packages consisted of drugs intended for distribution. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the narcotics trafficking activities of HERNANDEZ and OSUNA and their co-conspirators, such as telephone numbers, made and received calls, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the cellular telephones described herein.

31. Finally, drug conspiracies require detailed and intricate planning to successfully evade detection by law enforcement. In my professional training and experience, this requires planning and coordination in the days and weeks and often months prior to the event. Additionally, co-conspirators are often unaware of the subject's arrest and will continue to attempt to communicate with the subject after the arrest to determine the whereabouts of their valuable cargo. Accordingly, I respectfully request permission to search **Target Device 1** (belonging to HERNANDEZ) for data beginning on September 5, 2017, up to and including September 5, 2018. As stated above, HERNANDEZ was driving the smuggling vehicle—which was given to him for the purpose of smuggling—as early as November 16, 2017. I further request permission to search **Target Device 2** (belonging to OSUNA) for data beginning on May 5, 2018, up to and including September 5, 2018.

---

[1] Agents performed a cursory manual search of the Defendants' cell phones at the time of arrest (after Defendants' provided consent for the search). In an abundance of caution, I ask the court not to consider information agents may or may not have seen during that cursory search in determining whether there is probable cause for the requested warrants.

10

## METHODOLOGY

32. It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

33. Following the issuance of this warrant, I will collect the **Target Devices** and subject them to analysis. All forensic analysis of the data contained within the **Target Devices** and their memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

34. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual

11

review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

35. Based on all of the facts and circumstances described above, there is probable cause to conclude that HERNANDEZ and OSUNA used the **Target Devices** to facilitate violations of 21 U.S.C. §§ 841(a)(1), 846, 952, 960, and 963.

36. Because the **Target Devices** were promptly seized during the investigation of HERNANDEZ and OSUNA's trafficking activities and have been securely stored, there is probable cause to believe that evidence of illegal activities committed by HERNANDEZ and OSUNA continue to exist on the **Target Devices**.

37. THEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the items described in Attachments A-1 and A-2, and the seizure of items listed in Attachments B-1 and B-2, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Luis Corrales
Task Force Officer
Drug Enforcement Administration

SUBSCRIBED and SWORN to before me
this 21st day of September, 2018.

Honorable Nita L. Stormes
United States Magistrate Judge

12

## ATTACHMENT A-2

The following property is to be searched:

>One (1) gold colored Apple Cellular Phone
>Model: iPhone 8
>IMEI: 354837094640783

**Target Device 2** is currently in the possession of the Drug Enforcement Administration (DEA), San Ysidro Resident Office (SYRO) Non-Drug Evidence Custodian, located at 2255 Niels Bohr Court, San Diego, California 92154.

## ATTACHMENT B-2

Authorization to search **Target Device 2** described in Attachment A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in **Target Device 2** for evidence described below. The seizure and search of **Target Device 2** shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from **Target Device 2** will be electronic records, communications, and data such as emails, text messages, chats, and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of May 5, 2018 to and including September 5, 2018:

a. tending to identify attempts to import fentanyl or other federally controlled substances from Mexico into the United States, and to possess those substances with the intent to distribute them within the United States;

b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers— used to facilitate the importation of fentanyl, or other federally controlled substances from Mexico into the United States, and possession of those substances with the intent to distribute them within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in the importation of fentanyl, or other federally controlled substances from Mexico into the United States, and the possession of those substances with the intent to distribute them within the United States;

d. tending to identify travel to or presence at locations involved in the importation of fentanyl, or other federally controlled substances, from Mexico into the United States, and the possession of those substances with the intent to distribute them within the United States, including stash houses, load houses, and/or delivery points;

e. tending to identify the user of, or persons with control over or access to, cellular/mobile telephone(s); and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

**which are evidence of violations of Title 21, United States Code, Sections 841 and 846, and/or Sections 952, 960 and 963.**